Good morning and may it please the court. My name is Rachel Rose for James Riva. I would Once again, this court is faced with the question of whether the district court abused its discretion in denying Riva's request for equitable tolling. We would ask the court to make this decision again because the district court based its ruling on improper grounds, ignoring this court's clear instructions. The filings relied on by the district court were outside the tolling period based on the erroneous assumption that Riva's condition continuously improved and so filings before the tolling period were relevant because Riva's condition must have been worse back then. A quick review of the record will show that this is not the case. Riva was more organized and coherent during some periods prior to the tolling period than he ever was during periods in the tolling period. Contrast the lucidity of his oral argument from his 1986 suit alleging that he'd been falsely accused of poisoning coffee and lost his job in the kitchen, quoted on page 35 of the district court ruling, to notes from 1996 and 1998 bad periods referenced on page 31 to 32 of the district court ruling where he was thinking about spinal fluid, putting pieces of brain in his mouth, wanted to go off all of his meds, and particularly in 1998 believed that he wasn't insane when he killed his grandmother, which belief would substantially alter grounds of any of his filings. Specifically, in July of 1998, when he sent a letter inquiring about his habeas petition that was relied on by the district court, his medical record says he wants to go off all meds. When I killed my grandmother, I wasn't insane. I was eating a lot of bugs and drinking bad water from Florida. In December of 1998, he says he was convicted due to a conspiracy. Now, both of these actually, which just occurred to me, I would be happy to provide a supplemental brief on it, relate to a case where a different circuit court found equitable tolling based on mental incapacity. The petitioner in that case believed that he was a secret service agent and the government wanted him to stay in jail and didn't want him to appeal. So his delusion made him believe that no appeals was necessary. And this is similar to Reva saying he was convicted due to a conspiracy and that he was not insane when he killed his grandmother, which completely undercuts the basis of all the filings he'd been making up until that point. The cycles of sanity reported in the medical records reflect his confusion about his legal case and shifting priorities. He makes haphazard filings during his less lucid periods, which actually the Dr. Packer affidavit acknowledges, that he often makes his filings during less lucid periods. And then he fails to follow up on them when he improves. The affidavit from Dr. Packer also acknowledges that he was sane enough for most of the tolling period, but acknowledges that he had these frequent less lucid intervals. The question is not whether he was able to make earlier filings, it's whether his mental illness stopped him from properly following up on the dismissal of the 1996 habeas petition by filing his fourth motion for new trial. Now our expert, Dr. Montgomery Brower, says yes, Bridgewater may have found that his behavior was non-problematic, he wasn't hurting other inmates anymore, but that doesn't mean that he wasn't preoccupied with delusional ruminations, paranoia. Many times schizophrenics will actually withdraw into themselves, so that he's not bothering other patients is not necessarily an indication that he's sane at that time. Counsel, counsel, aren't we, we're focused on basically a 34 month period between April of 96 and March of 99. Yes. And in, at the beginning of that period, he was prosecuting his second habeas proceeding. I understand he filed it in February of 96 with a memo of law, he then kept following up on it, a letter to the clerk in June, he requested default, and then finally in November he asked for, to dismiss for exhaustion. Doesn't that tell us that during that time period he was certainly not so severely impaired that he could not pursue legal relief? He was not effectively pursuing legal relief at that point, Your Honor. His, of course, his revise and revoke motion was years late and had already been filed by his original counsel. His requesting dismissal of his second habeas petition is why we're back here now. Had he required the, had he asked for the petition to be stayed correctly, then he would have been able to exhaust his un-exhausted claims, come back, and fill in period would not be an issue. Let me just interrupt you for a second, and I should have been more precise in the question. When I'm referring to, it's not an issue as to whether he's performing as well as competent counsel would be. It's a question of whether his mental illness so severely impaired his ability to pursue legal relief that we should deem it told as a matter of law. When someone files briefs that talk about the right things, are coherent, even if it's poor lawyering, how do we find that that person meets that test? Well, I, the comparison of what it takes to bring, to bring his original legal motions and what it takes to follow up on his habeas case and exhaust his, exhaust his remaining issues in the state court, I would argue that it requires a longer period of time and more concentration he has to remember to follow up on filings that he makes, which is a consistent problem that he has. Simply his periods of sanity are too short to, to account for his being able to successfully file his fourth motion for new trial and preserve his habeas petition. In, during that time, of course, in the beginning of 1996 was when he had his first bad period. He took apart a radiator and was sent to ICU. It's clear that he was able to pick back up on his letters, on his revised and revoked motion and his habeas petition in another lucid period following that. And it's possible that this court may then say that perhaps some of that period would be, would not be told. But over the entire period, his, his sanity is very much up and down. The second- Let me ask, isn't there an expert report that says from June of 96 to June of 98, he began that period with residual symptoms but gradually became more stable throughout that period? Is that, I'm sorry, is that Dr. Packer's affidavit saying throughout the entire tolling period? I can't remember which, which, but it is, yes, the affidavit that addresses his ability during the tolling period. Well, Dr. Packer's affidavit was not specifically relied on by the district court in making its decision, and I would argue that it's actually not terribly well grounded. The original Packer affidavit refers to the erroneous conception that Reba had filed a 1998 pro se third motion for a new trial that the district court placed, based its first ruling on that caused this court to reverse. And so he, he goes back and says that again in his first affidavit that's on page A-497 of the appendix. And then in his second affidavit, he tries to correct that but fails to do so. He seems to think that confusing Reba's third motion for a new trial, which was filed, counseled, without much help, in 1995, and his fourth motion for a new trial, which was a one-page pro se pleading, filed in 1999. As you see, he's giving the dates for it and says, oh, that's what I was referring to. But if you go back to his first affidavit, he said it was titled Petitioner's third motion for a new trial. So obviously he's not talking about the fourth motion for a new trial, which is entitled that. Can I ask you how to think about the standard of review and what it means for us here? So if the evidence is that he's got a very serious mental disability or impairment, but the way it manifests itself is there's obviously periods of lucidity because the filings demonstrate that, right, that he can make filings that are, that show a lucid person. At the same time, the filings aren't timely, which is why we reach equitable tolling. Right. So we then, I mean, you can read it either way. That shows that he has an impairment which manifests itself in untimeliness, and therefore he shouldn't be charged with it. Alternatively, it shows that he can be lucid enough, and that might reflect itself in, you know, sometimes being late, like people who don't have mental impairments are sometimes late, and they don't get the benefit of equitable tolling. So if that's what the record looks like, we then give it to a district court, and we are supposed to review that district court finding with some deference. If they make a bunch of factual and legal errors, we reverse them, and we did in this case. And we've assigned So what is sort of the error that the district court did here that deprives it of the deference that we would accord it in exercising its discretion to make what, you know, seems like a difficult judgment call given the facts that were before it? Essentially the same errors as the first time, Your Honor. The argument is the district court relied on filings outside the tolling period. It doesn't matter whether Reva was sane before if he was insane later. And he also treated Reva's intelligence as an important factor, and actually that was the basis that he used to distinguish our primary case, which was otherwise extremely close to Reva's situation. Ben V. Greiner, and that was from the Eastern District of New York in 2003. The petitioner in that case was taking antipsychotic medication. He was incarcerated in a psychiatric institution. He had auditory hallucinations, paranoid thinking, et cetera, et cetera. And this court's instructions were that it's not relevant how intelligent Reva is. It's important how insane he was, essentially. And the district court, when they went back to this, distinguished that case based on the end of it where they mentioned that the petitioner in that case, Ben V. Greiner, was also very intellectually disabled. So essentially that is the only distinguishment from Reva, that he was intellectually disabled and he was a paranoid schizophrenic. However, he was granted equitable tolling based on mental disturbances, not on a low level of intelligence. Is there any factual finding, not its conclusion, but any factual finding that the district court made that you say there's no support in the record for the finding? Yes. When he says that he believes Reva was lying about his cooperation with Attorney Smith in 1998, Attorney Smith passed away shortly after that habeas petition was filed. And the district court believed that Reva was essentially lying to him about whether he had ever spoken to her because of the date of her death. He had originally thought it was before the petition was filed. It turned out it was after. If you look in the medical records in April of 1997, it says in the notes, last Wednesday his appeals lawyer had a stroke. So it is extremely unlikely that Attorney Smith was actively working on this case with Reva in the time between her stroke and her death about a year later. Finally, I would say that the coherence of his pleadings is less important than whether they are the right pleadings and whether they're followed up on. He convinced the judge to let him have his head x-rayed because he thought that he'd had a childhood lobotomy. Obviously he can write pleadings that are put together in service of his insane interests, but that doesn't mean that his asking for the x-ray was an example of effective use of the legal system. Are there any other factual, you've given us one factual finding to look at. Is there any other factual finding that Judge Wolf made that you say is unsupported by the record? That his, essentially that his filings from before the tolling period are relevant because he was more sane back then. I don't think that's supported by the record. But suppose there's a medical report that says he's improving throughout that period, then doesn't knowing what the baseline is actually become relevant? The baseline is his murder of his grandmother in 1980. There's a lot of room to improve from there without necessarily being able to You're talking about continuous to the tolling period. Oh, continuous improvement through the tolling period. That's, they're speaking in the record about Mr. Riva's behavior as being, as improving continuously throughout the tolling period. He's more under controlled, but that doesn't mean he's not paranoid. The mentions of his paranoia throughout the record are numerous. I'd like to use my last minute and possibly take the two minutes I reserved to discuss actual innocence. Before you do, just one more question. Is there any evidence directly in the record about specific episodes he had at crucial times where the deadline was coming up for filing? Yes. Well, 1998 and 1997 and 1996 are the worst parts. There's actually a large gap in the record that's from October of 1997 to May of 1998 where we have no records from 1998. He was in, nothing was filed during that time except for the habeas petition submitted by Attorney Smith. So during, in 1998, however, there's a great deal of talk about increased paranoia, judgment very poor, thoughts of hunting people that pissed me off, anxiety about the treatment team. He's, he, oh, I'll use the remainder of my time. You may finish answering that question. Sorry, I lost my place. Could you ask me again, please? You were going through periods in the record. Oh, his bad periods, yes. His paranoia, oh yes, one of the other grounds relied on by the district court was that Reva told his treatment team he was going to get an attorney to help him get off of his medications. It's, I would posit this is not an example of effective use of the legal system. Not only is there no proof he ever actually sent a letter or was replied to, but he must have been told many, many, many times at this point that there is no way he can, he can force them to make him, them take him off his meds. Thank you. But you did cover actual innocence in your briefs, which we read. May it please the court, my name is Annette Benedetto. I represent the respondent in this action. Some years ago this court remanded this case for further factual development to determine whether there was a causal connection between Mr. Reva's mental capacity and his ability to create legal channels. On remand, considerable investigation went into satisfying what were the gaps and omissions and misrepresentations and other things that went on in the original case. The record would considerably expand it. These commonwealth retained the record and allowed a forensic psychologist to respond to the petitioner's forensic psychologist, because one of the criticisms of this court was that many of the facts and analysis was uncontradicted. So on remand, Judge Wolf conducted several hearings and we had extensive, the court reviewed and tried to locate the papers and pleadings of Mr. Reva during this particular tolling period. Hearings were held and as a result, the district court, as this court is aware, denied the petition and claimed that the petitioner had failed to bear his witness and the fact that he was quite late in filing his petition and whether equitable tolling was justified. The court decided it was not warranted. And in a very comprehensive decision, Judge Wolf traced from 1981 through to 1999 everything that Mr. Reva did, everything his lawyers did during that particular period. And I would suggest to this court that there was no abuse of discretion. In Judge Wolf concluding that, there was no causal connection. There is certainly no doubt, and Judge Reva, excuse me, Judge Wolf admitted, there's no doubt that Mr. Reva is a troubled person, that he has a mental illness. But however, during that mental illness, he was able to file pro se many memos, many motions, he could cooperate with his attorney, and the proof is really in this particular record. Just to talk about the decision of Judge Wolf, he based his decision on seven factors, and I can go through them very quickly. One of them is the 1996 Habeas Corpus petition, which the petitioner filed himself. It was pro se all the way. And this is an example of somebody who really knows what's going on in court, because he did things that some lawyers don't know how to do, which is, first of all, he filed his petition. He filed a memorandum in support. When it was not served and it was defaulted, he moved to remove the default. He appealed to this court. He actually filed, and it's in the record, of course, several motions in this particular tolling period that indicate that he knew exactly what was going on. Eventually, he did withdraw his 1996 Habeas Corpus petition, but at the same time, he was going back into state court and pursuing another of his post-conviction motions, his motion to revise and revert, which is a very telling motion itself. So after the 1996 petition was withdrawn, because in his motion, he correctly noted that there was no exhaustion of these state remedies. So he withdrew his petition. But in contemporaneous with that, and Judge Wolf does a very comprehensive job of juxtaposing the federal, his federal actions and his state actions. But at any rate, during that particular period, he was navigating and pursuing this motion, his second motion to revise and revoke, which had been filed some years before. It had laid dormant on the docket sheet he wrote to Judge Brady and wanted it to be moved up, wanted a hearing on it. He filed an opposition to the Commonwealth's motion to quash the motion. And that particular motion was during this tolling period. Now as for the 1998 petition, there were misrepresentations that this court relied on regarding who filed it and when. And the petitioner in several affidavits said that he had no knowledge of this, that his father had hired Barbara Smith to represent the court that responded in this action, and that he was not aware. And after her death, it was filed by her associates. The fact of the matter is that was disproved. The district court located the petition. It was signed by Ms. Barbara Smith and accompanied by Mr. Areva's signature. So I mean, this particular episode in 1998 is not very complete. It's true. But Judge Wolf decided that the misrepresentations, the fact that the issues that are advanced by Mr. Areva, which are pretty similar throughout all his pleadings, were pretty much the same with Ms. Smith. They had communication. And the misrepresentations sort of caught against him. And the fact that Ms. Smith was a very well-renowned and well-regarded attorney and the former Chief of the Appeals Division of the Attorney General's Office. But the fact of the matter is that Judge Wolf clearly, in my estimation, was meticulous in listening to what this court wanted regarding this particular case. And he's gone through it point by point regarding, you know, what this court had wanted him to analyze in this particular case. Some of the other points that, besides the 1996 and 1998 hate petition, it talks about the relationship between Mr. Areva and his attorneys. And there are letters that this court can see. There are a couple of letters, more than a couple of letters cited by Judge Wolf, the Pasolaco letters, which are very lengthy letters in which he discusses his case with his attorney. There's a letter in the record of Mr. Areva writing to his trial attorney, Ms. Smith, Mr. Spinelli, who he was very unhappy with. But some 15 years later, in 1995, he wrote to Mr. Spinelli and asked Mr. Spinelli for an affidavit that, sitting in the prisoner's dock, which is one of Mr. Areva's claims, was not part of a trial strategy. And Mr. Spinelli sent an affidavit agreeing with that. It was misplaced. And Mr. Areva wrote again and another affidavit was sent. And he wrote a little note to Mr. Spinelli thanking him for his cooperation and saying how grateful he was that he had complied with the second request. So there's many letters in the file from Mr. Areva to Judge Brady about his cases to his attorney. So there was the ability for Mr. Areva to cooperate with his attorneys. Granted, he wasn't happy with his attorneys. And they had excellent attorneys, frankly, as they were cited by Judge Wolf in his decision. Some of the other facts that Judge Wolf relied on, there was some 1986 and 1987, Mr. Areva filed some civil rights actions, two of them, that he proceeded to completion. One of them, was regarding the grievance procedures in Bridgewater. He was succeeded before Judge Skinner in getting a favorable decision. At least initially, the motion to dismiss by the Commonwealth was denied. And on appeal, excuse me, at the next stage after memos had been filed, the court decided that there was no constitutional right involved in the right for a grievance procedure at Bridgewater. And this is the late 80s. And that case went up to the Supreme Court. It went up to this court and was denied. And it was Mr. Areva's pro se litigation. While at the time he was in Bridgewater State Hospital. So the issue is, of course, the connection between his mental health and his ability to navigate and litigate. And there's been no connection. The petitioner really has not borne his burden of proving such a causal reason. So stressing his mental health issues, of course, is probably their best argument. But there's just no connection. And we found many pleadings. Mr. Areva went in one of his appeals he filed for direct appellate review with a full memorandum plus letters to the clerk over at the SJC. The record is really very strong, I would tell this court. And Judge Wolf clearly took this case extremely seriously and listened to this court's advice very seriously. Part of their argument has to do with his ability to persist. That his illness is such that even though he can do certain things, he can't persist in his legal efforts long enough to carry through to completion during the requested tolling period because of this condition. Well, the two cases, the civil rights cases, Reaver v. Getchell and Reaver v. Tees, were both litigated to a conclusion. So we could sustain his interest in the 80s. This is in 87 and 88. His motion to revise, his second motion to revise and revoke, I mean that was three years he had filed it before the period. In this period, he revived it. And this is the motion to revise and revoke. It's in the record, Your Honor, in which he contacted his attorney to get affidavits to support his prisoner's dock claim. And he wrote to Judge Brady regarding the case. And he got it moved up. The commonwealth was alerted to this motion to revise and revoke that was during the period. And they filed a competing memorandum over a period of time. It was denied, but he, and it's in the record, but he was able to sustain his interest during this particular period and this particular situation. What do you say to the argument that sure, he was able, his paranoia didn't prevent him from writing briefs, writing letters, having coherent reasoning in the letter, but it prevented him from even perceiving what he should be doing those things about? If someone files competent briefs for five years with excellently written letters saying that Martians are controlling their behavior, we wouldn't find them competent. Now this isn't as extreme, but what about the argument that it's prevented him from, it's impaired him from perceiving the relief that he should be pursuing, which he now wants to pursue? Well, if that was Dr. Brower, his forensic experts thought that they were, his pleadings were too repetitive, but Judge Wolf dealt with that. And of course the pleadings are before this court. It can make its own decision. But of course it's Judge Wolf's decision that's under review. These pleadings are cogent, they're articulate, as Dr. Packer found, the expert. He cited examples, many examples of his ability to reason. The fact of the matter is the judge felt that they, rather than being repetitive, they were as lawyers write, of course. He has certain issues that he pushes, there's no question. But that doesn't mean he's somehow on a scale where, as Dr. Brower said, they're just wrote and they're parroting one another. I mean that's really, to be honest with you, that's a legal decision. That's not, the forensic psychologist can look at pleadings and have one idea, and I think a lawyer can look at them and have another idea. So frankly, I would respect Judge Wolf's assessment that they were well pleaded. Anything else? Your time is up. Okay. Thank you. Thank the court for their interest and forbearance. Thank you. I would just like to touch on one or two points. Firstly, my sister counsel makes the argument that because the arguments in Attorney Smith's habeas petition were the same as Reeve's second habeas petition that shows that he somehow was working with her. We argue in our brief, and I would reiterate that this actually shows the opposite. What he needed to do next was to go back to state court and exhaust those issues, not to file the exact same habeas petition again and have it dismissed again for the same reasons. I would also point out that many of the items relied on were also outside the tolling period. Requesting the affidavit from Spinelli occurred after he had already become largely sane, after he had begun treatment with elazapine, which really made the turning point. In the correspondence with Attorney Pasolacqua, that was during one of Reeve's good periods. He had many good periods. In 1987, his lawsuit was a good period. In 1995, his working with that appellate attorney was a good period. But as we've been arguing from the beginning of this case, that he had good periods in the past does not mean that he was having a good period during the tolling period. Thank you very much.